# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Command Languages, Inc. d/b/a CLI Solutions | ) ASBCA No. 61216 |
| | ) |
| Under Contract No. W56HZV-15-C-0200 | ) |

APPEARANCES FOR THE APPELLANT:        Eric Whytsell, Esq.
        Rodney W. Stieger, Esq.
         Stinson LLP
         Denver, CO

        Scott R. Williamson, Esq.
         Williamson Law Group LLC
         Frederick, MD

APPEARANCES FOR THE GOVERNMENT:        Scott N. Flesch, Esq.
         Army Chief Trial Attorney
         MAJ Ronald M. Herrmann, JA
         Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE KINNER

Appellant, Command Languages, Inc. d/b/a CLI Solutions (CLI) challenges the denial of its claim by the Army Contracting Command (ACC) regarding its creation of technical manuals (TMs) and programs of instruction (POIs) for training the Afghanistan National Army (ANA) to maintain an armored vehicle provided under prior contracts. CLI claims ACC required it to include descriptions of lower level maintenance tasks that were beyond the scope of its contract to create higher level manuals. A hearing of this appeal was conducted August 13-14, 2018. Only entitlement is before the Board.

## FINDINGS OF FACT

As a result of a Foreign Military Sales (FMS) program, Afghan forces have been supplied an enhanced version of the Army's M-117 Armored Security Vehicle (ASV) (tr. 1/206, 2/52-55). This enhanced armored vehicle, called the Mobile Strike Force Vehicle (MSFV), is manufactured by Textron (*id.*). As the original equipment manufacturer (OEM), Textron also provided maintenance manuals (tr. 1/135, 2/53, 2/94). The OEM manuals covered two basic levels of maintenance (tr. 2/94). The Army classifies equipment maintenance by four levels, 10, 20, 30, and 40 (tr. 1/31-32). Level 10 maintenance is performed by the equipment operator (tr. 2/62). Level 20

maintenance is performed by the organizational unit which operates the equipment (*id.*). Level 30 maintenance includes tasks that are more than a unit can perform, including some refurbishing (*id.*). Maintenance tasks at the 40 level are tasks performed at a national depot level, such as refurbishment, overhauls, etc. (tr. 2/62-63).

When the Army considered obtaining new maintenance manuals for the MSFV, the OEM 10 and 20 level manuals were already in use in Afghanistan (tr. 1/68, 1/180, 2/17, 2/93, 2/112-15). The OEM manuals had been translated by computer programs into Dari and Pashtu (tr. 2/55). Computer translations are not as accurate as manual translation services (tr. 1/25). Nonetheless, using the computer translated MSFV manuals and programs of instruction, Afghan soldiers had already received a 20 week training program that taught the MSFV 10 and 20 level manuals tasks (tr. 2/63, 2/113).

The Army did not have 30 and 40 level manuals to support more advanced training (tr. 2/63). Having received critical evaluations of the computer translation of the OEM manuals, the ACC Allied Tactical Vehicle program office (ATV) was determined to ensure that MSFV manuals for higher level maintenance tasks would be made easily understandable by Afghan personnel (R4, tab 10 at 133; tr. 2/95-97). The OEM manuals were written at a 7th-10th grade reading level, which is typical of technical manuals (tr. 1/69, 1/85-87, 1/122-23, 1/137, 2/93, 2/97). Therefore, the program office sought to procure more accurately translated 30 and 40 level manuals, but at a 3rd grade reading level (tr. 2/148).

The program office was familiar with a previous contract for simplified contract manuals and used that contract as a sample for what was sought in the contract for 30 and 40 level MSFV manuals (tr. 2/58, 2/139). Over time, as the requirements office developed the statement of work, it became "relatively clear" what they were looking for in a new contract (tr. 2/147-48). The maintenance tasks for the new manuals were not drawn from the Textron manuals (tr. 2/11-13). Instead, Christopher Simons, ATV contracting officer representative (COTR), created a new maintenance allocation chart task list, which was derived from 30 and 40 level manuals for the ASV, and some tasks from the existing MSFV manuals (*id.*). The goal was to procure technical manuals that would "allow primarily people from an agrarian background with an average third grade level of literacy, the ability to look at a pictorial display and understand how to [perform maintenance tasks] for the MSFV. . . and it would be easier [for a person] with that background to understand pictures rather than just using words" (tr. 2/142).

The Army published a combined synopsis and solicitation on the FedBizOps.gov website for simplified 30 and 40 level manuals and programs of instruction for the MSFV on February 18, 2015 (R4, tab 2). The FedBizOps announcement informed potential offerors that it was the only "solicitation; proposals are being requested and a written solicitation will not be issued" (*id.* at 66). In

2

accordance with FAR 52.212-1(g), the solicitation stated that the government intended to award a contract without discussions, but it reserved the right to conduct discussions if it was determined by the contracting officer to be necessary (*id.* at 69). "In addition, the government reserve[d] the right, without entering discussions, to request additional information necessary to support the offeror's price in order to determine price reasonableness" (*id.*). The government never used these provisions to clarify CLI's proposal or its price.

The desired pictorial nature of the 30 and 40 level manuals was not described in the FedBizOps announcement in the Rule 4 file (R4, tabs 2, 3). Between March 2 and April 7, 2015 the FedBizOps solicitation was amended eleven times (R4, tabs 5-16). On March 15, 2015, contrary to the statement in the initial announcement, ACC issued a second version of the solicitation as a written hard copy (R4, tab 10). The second version was issued with the same solicitation number, although amendments that followed were issued via FedBizOps (R4, tabs 11-16). Any offeror submitting a proposal in response to the FedBizOps solicitation received a copy of the second hard copy solicitation (tr. 1/210-11).

The requirement for pictorial display of the maintenance tasks to be described in the new 30 and 40 level manuals was reflected in the second solicitation and in the final contract on July 15, 2015 (R4, tab 1 at 28, tab 10 at 133). Paragraph C.2.1. of the statement of work states that "[t]he contractor shall include relevant photos of individual steps within tasks with concise active support language to coincide with the pictorial step by step approach. The TMs and POI shall be written at a literacy level commensurate with a Western 3rd Grade Primary School comprehension level when such step down in presentation/approach will not degrade the context and intent of the task" (*id.*).

Both government and CLI witnesses understood that the purpose of the procurement was to obtain 30 and 40 level manuals, not 10 and 20 level task descriptions (tr. 1/67, 1/132, 1/144, 1/174, 1/201-02, 1/213, 2/17, 2/63, 2/93, 2/116). Paragraph C.1.1. states "[c]urrently the ANA have 10 and 20 level technical manuals and programs of instruction, but need TMs and POI for 30 and 40 level maintenance" (R4, tab 1 at 28, tab 10 at 132-33). And, "[t]his effort is to develop and deliver 30 and 40 level TMs with associated POI, to promote an organic MSFV sustainment capability within the ANA" (*id.*).

This dispute is centered on the sentence that appears between those statements in C.1.1.: "The 10 and 20 level TMs and associated POI are provided to authorized sources as government furnished information (GFI) for reference" (*id.*). Paragraph C.2.2. of the contract statement of work lists information provided as GFI, including ASV manuals and other technical manuals "provided as a reference point for TM development" (R4, tab 1 at 28). That paragraph instructed CLI to develop new tasks

3

for the MSFV that are not described in the ASV manuals and that the remaining GFI was for its "knowledge and reference" (*id.*). Similarly, paragraph C.5.2. of the statement of work stated that the government would provide the existing ASV and MSFV manuals "to be used as reference material" during the contractor's development of the new manuals (R4, tab 1 at 30, tab 10 at 134). But that paragraph concluded with a statement that the "contractor shall make use of any government provided information to the maximum extent practicable" (*id.*).

Prior to submission of bids, offerors submitted numerous questions to the government seeking advice for formulation of their proposals. These questions, and the government's answers, were documented in a log which was included in the solicitation by amendments to the FedBizOps solicitation (R4, tabs 4, 5, 8, 9, 11, 13, 14, 16). As reflected on the log that was added to the contract on March 12, 2015, using the disjunctive "or" in question 47, two questions were posed (R4, tab 8 at 108). First, the government was specifically asked whether it would be acceptable to reference the maintenance manual or operator's manual for equipment conditions and other references in the 30 and 40 level manuals (*id.*). The government's response to the first part of that question was "yes, reference existing manuals" (*id.*). That response was reinforced by the government's response to the second part of the question. The request asked if tasks in other manuals would have to be replicated in the new manuals (*id.*). The government answered: "no need to replicate" (*id.*). Question 47 and the government's response was reiterated in the next amendment as well (R4, tab 9 at 109).

CLI joined with Lionbridge Global Solutions II, Inc. to bid upon the contract for 30 and 40 level MSFV manuals (R4, tab 17 at 182). Their proposal was submitted April 14, 2015 (*id.*). CLI declined to modify its price after the various modifications to the solicitation (R4, tab 21 at 231; tr. 1/43). The proposal specifically described CLI's plan to perform the contract (R4, tab 17 at 187-88). The CLI plan stated that during development of the manuals "[a]ny remove and install tasks already written in the 10 and 20 manuals will be referenced as needed to perform the repair tasks" (*id.* at 187). No government witness possessed familiarity with CLI's work plan, much less appeared to have closely read the proposal (gov't reply br. at 6 ¶ 17). The ACC officials testified that they did not look at CLI's plan to perform because it was not their job to say how the work would be done (tr. 2/106, 2/121, 2/127).

As part of their determination not to consider the manner in which CLI planned to create the manuals, ACC made no attempt to evaluate the proposal beyond a careful assessment of the sample translation (tr. 2/64, 2/120-21, 2/163). The remainder of the information in CLI's offer was considered irrelevant, including where the proposal stated that wherever possible, CLI would describe maintenance tasks only by references to the existing manuals (tr. 2/47). The CLI sample translation was forwarded to the instructor at the armored branch school in Kabul, Afghanistan

4

(tr. 2/64). Once that translation sample was rated "most favorably" in Kabul, CLI's proposal was deemed technically acceptable (tr. 2/65). Based upon that evaluation, and its very low price, CLI was awarded the contract on July 15, 2015 (R4, tab 1; tr. 2/66-67, 2/120).

The ACC officials, however, were concerned with the very low price offered by CLI (tr. 2/49, 2/66, 2/117-18). That offer was "drastically" below the government estimate (tr. 2/120). No government official reviewed the proposal to determine why CLI's price was low (*id.*). The contracting officer was so concerned, he attended the "start of work" meeting on August 4-5, 2015, prior to CLI commencing performance (tr. 2/101). He attended specifically to confirm that CLI understood the scope of the work (*id.*). He did so by asking CLI representatives if they understood the work involved in the contract (tr. 2/121). The contracting officer offered CLI the opportunity to abandon the contract with no other consequences if it realized it could not fully perform the work (tr. 2/151). The only concern conveyed by the government was that CLI's price was very low (tr. 1/136). As reflected in the meeting minutes, no official described a reason for the government's concerns regarding CLI's price (R4, tab 24 at 274). Thus, without any indication of the basis for the contracting officer's concerns, CLI's only response was that it understood the scope of work required by the contract and it was comfortable with the price it offered to perform that work (tr. 2/151). At that meeting, CLI also explained that it had planned to refer to 10 and 20 level manuals wherever possible to reduce its cost of performance. No one in the government heard that explanation. (Gov't reply br. at 6 ¶ 17; tr. 1/46-47, 1/77-78)

CLI's plan to use "reference only" descriptions was not only described orally at the "start of work" meeting. CLI presented slides at that meeting describing its technical manual development process. (R4, tab 23 at 247-48; tr. 1/45). Each of the attendees at the meeting received a hard copy of CLI's presentation (tr. 1/99). CLI witnesses described the presentation of the slides as a "standard presentation" in which they reviewed the slides with the Army team and discussed the content of each (tr. 1/47). In its presentation CLI reviewed "exactly how we were planning on executing the contract" (tr. 1/46). It was always CLI's plan to reference anything in the 10 and 20 level manuals so the new manuals would not duplicate anything that already existed (tr. 1/94). The development process described on the slides was "taken right from 4.1.1 of the proposal" (R4, tab 17 at 187, tab 23 at 248; tr. 1/46, 1/93). As reflected in the proposal, CLI's slide stated: "[a]ll remove and install tasks already written in the 10 and 20 [level] manuals will be referenced as needed to perform the tasks" (tr. 1/46).

Donald Mackenzie, Director of North America sales for Lionbridge, did not recall the plan to use 10 and 20 level manual references as a point of discussion at the meeting, but he was certain this approach was part of the presentation (tr. 1/47). Brian Ditmer, Lionbridge Director of Technical Publications, described CLI's presentation which showed its processes and samples (tr. 1/95). Like Mr. MacKenzie,

Mr. Ditmer did not recall any government comments on the plan to refer to 10 and 20 level manuals in the new 30 and 40 level manuals (tr. 1/47, 1/95). The CLI team was very positive leaving the "start of work" meeting because they believed the government team was "on same page and ready to move forward" (tr. 1/49).

CLI received a similar response from the government to the sample 30 level manual work packages it submitted a few days after the start of work meeting (app. supp. R4, tab 71 at 1576). CLI submitted those samples August 10, 2015 to show the government their progress, and "get the government to sign off that they were headed in right direction" (tr. 1/95-96). The sole description of the tasks in CLI's sample work packages 24, 38, and 46, is a reference to the 10 and 20 level manuals (app. supp. R4, tab 72 at 1577-82). For sample work packages 68, 70, and 75, the tasks are described in numerous specific steps that relate to accompanying photographs and drawings of the applicable mechanical component in which the parts addressed in the task description were identified (app. supp. R4, tab 72 at 1583-1605).

CLI commenced work and was able to produce further examples of its progress by the September 9, 2015 interim progress review (IPR). At that meeting, CLI showed the government its progress on the 30 level pre-technical manuals (PTMs) and its delivery schedule (tr. 1/61). The discussion focused on presentation of data from the ASV manuals in the 30 and 40 level manuals (tr. 96-97). CLI reported that the PTMs were 80-85 percent complete (R4, tab 31; tr. 1/62). The minutes prepared by CLI, reflect that the government emphasized that all maintenance tasks were to be rewritten at a 3rd grade literacy level, incorporating a step by step pictorial approach to PTM development (R4, tab 31). Mr. MacKenzie testified that the Army's insistence at the meeting that ASV tasks included in the 30 and 40 level manuals had to be written to a 3rd grade level made sense to him (tr. 1/62). Because CLI already understood the goal to achieve lower literacy in the new 30 and 40 level manuals, Mr. MacKenzie agreed that ASV tasks "weren't, so they needed to be done" (id.). There were no government comments regarding tasks in the PTMs that were described only by reference to the 10 and 20 level manuals (tr. 1/62-63, 1/101).

The same is true of the government's comments on the PTMs CLI provided September 28, 2015. CLI received comments from Mr. Simons on the first PTMs on October 18, 2015 (tr. 1/109). Mr. Simons' comments primarily pertained to the volume of photographs utilized by CLI. None of the comments suggested he considered the use of reference-only tasks unacceptable (tr. 1/112). There was nothing in the comments regarding the descriptions that only referenced 10 and 20 level manuals (tr. 1/114-16). Specifically, there were no comments on any of the reference-only tasks in any of the work packages (R4, tab 81 at 2277-2642; tr. 1/119-24). Mr. Simons made no comments on a PTM in which every task description relied upon references to 10 and 20 level manuals (R4, tab 33; tr. 1/117).

6

Instead, the common thread in Mr. Simons' comments was his concern for a lack of photographs or insufficient break down of the steps to perform the maintenance tasks (tr. 1/113). CLI made changes in response to the comments it received (tr. 1/128). There were subsequent discussions regarding the difficulty of reducing some technical terms to a 3rd grade reading level (tr. 1/141). The parties compromised on a solution to that problem (tr. 1/137-39). By November 15, 2015, CLI had delivered draft 30 level manuals and begun substantial work on 40 level manuals (tr. 1/156). CLI believed there had been a good communication chain between it and the government (id.). It submitted a revised PTM on November 30, 2015 (tr. 1/128). At that point, CLI considered the 30 level manuals nearly complete and it was expecting comments on the draft 40 level manuals it submitted in November (tr. 1/163-64).

In December, CLI received the government's comments on the second PTM draft submission. CLI considered those comments to be outside the scope of the contract (R4, tab 41 at 574; tr. 1/156-57). For the first time, the government's comments indicated that the work packages could not include references to the 10 and 20 level manuals (tr. 1/57). On January 25, 2016, the parties discussed the government's second round comments on the 30 level manuals by teleconference (R4, tab 38 at 559; tr. 1/159-60). James Markley, CLI's director of operations, and Mr. Ditmar informed the government that the comments received were an "extreme surprise" because they differed from the first round comments and conflicted with the government's responses to CLI's plan to use references to the 10 and 20 level manuals prior to that meeting (tr. 1/161- 63). CLI informed the government that its objection to reference-only task descriptions would require all of its work to be redone and substantial duplication in rewritten manuals (tr. 1/64-65, 1/163). Mr. Markley testified that the company would not have proceeded after the "start of work" meeting if it had known of the government's objections to its approach (tr. 1/165-66).

The government asked CLI to determine a plan to meet the government's desired approach and its requirements to incorporate the 10 and 20 level manuals (tr. 1/167). CLI responded February 10, 2016 with two options: 1) add line items to the contract statement of work that require production of new 10 and 20 level manuals with the same pictorial approach used in the new 30 and 40 level manuals or 2) add CLINS to the contract to support redoing the 10 and 20 level tasks that were included in the Army prescribed task list (R4, tab 41 at 574-75; tr. 1/169). CLI proposed to provide prices to perform either of these options.

Prior to the contract, when evaluating CLI's proposal, Mr. Simons assumed the government could correct a contractor's work if he found it unacceptable by defaulting that contractor (tr. 2/51). Apparently carrying out that plan, when the government was dissatisfied with CLI's February 10, 2016 response it issued a cure notice on March 21, 2016 (R4, tab 44). Rather than suffer default of its contract, CLI complied with the

government's wishes and redid the manuals excluding references to 10 and 20 level manuals (tr. 1/66). On September 20, 2016, CLI submitted a claim to the contracting officer for $962,020.70 for its increased scope of work (R4, tab 64). The contracting officer issued a final decision on March 14, 2016 denying the claim (R4, tab 67). CLI filed its notice of this appeal on June 8, 2017.

DECISION

As noted above, the parties focus this dispute upon the terms of the contract which describe the 10 and 20 level manuals as provided to CLI for reference. The government poses the issue to be decided as one of contract interpretation. To the extent there is any question as to the interpretation of the relevant terms of the contract, it is resolved by the plain terms of the statement of work which exclude 10 and 20 level tasks. This contract required production of 30 and 40 level manuals and associated programs of instruction, and no more. The Army, however, argues that 10 and 20 level manuals were inherently incorporated in the work of the contract. This argument is premised on its analysis that ANA personnel cannot perform 30 and 40 level tasks without first accomplishing 10 and 20 level tasks. The Army asserts that the goal to achieve an organic maintenance capability in the ANA with simplified technical manuals cannot be met if the 30 and 40 level manuals require the ANA to also rely upon the poorly translated higher literacy level 10 and 20 level manuals. That may be, but this contract did not obligate CLI to achieve the Army's goal, but only to create and produce simplified 30 and 40 level manuals at a 3rd grade literacy, translated into Dari and Pashtu. Whatever aspirational goals the Army may find in the contract, without more, they did not bind CLI to perform work that was otherwise excluded from the statement of work. *Blount Bros. Constr. Co. v. United States*, 346 F.2d 962, 971 (Ct. Cl. 1965) (the intention in the minds of government designers is of no consequence unless communicated to bidders); critically, the questions and answers incorporated into the contract permitted the approach taken by CLI here.

The government also bases its arguments upon a detailed linguistic analysis of the function and interpretation of the word "reference" as it is used in the text of the statement of work. Even if that analysis were precise and correct, for the portion of the contract cited in isolation, it does not advance the government's reading of the contract. The Army's analysis reads the term "reference" in section C of the contract to eliminate CLI's ability to use the GFI as anything other than library materials. The Army characterizes CLI's interpretation to use GFI for reference within the 30 and 40 level manuals as creating an affirmative and specific duty. Such confined understanding of that term does not reflect a reasonable reading of the term in the context of the statement of work.

8

Contrary to creating a contractor duty, the contract gave CLI the option to utilize GFI in the most effective manner it chose when creating the new manuals. CLI's approach reflects its decision how best to utilize the 10 and 20 level manuals, and complies with the direction elsewhere in the statement of work to maximize the use of the GFI. There is no language in the contract that forbids the approach taken by CLI. Moreover, the government appeared to approve of CLI's approach at every step of the procurement: the solicitation and contract required creating 30 and 40 level manuals not 10 and 20 level manuals; the government's pre-bid answer clarified that use of the GFI as intended by CLI was contractually permissible; the government accepted the reference-only procedure that was explicitly described in CLI's proposal; it failed to consider, much less question, the approach in the proposal samples; it ignored the contractor's information at the "start of work" meeting; ATV officials made no comment on the allegedly offending "reference-only" approach in three sets of samples after commencement of work; and those officials accepted the use of references to GFI in the first review of the draft manuals. The Army cannot now ignore those events by insisting that the contract can only be interpreted by means of its refined grammatical application of the term "reference".

Having failed to articulate its desire to obtain simplified pictorial 10 and 20 level manuals* as well as the contracted for 30 and 40 level manuals, the Army attempts to shift responsibility for that failure onto CLI. The Army argues that CLI's appeal must be denied because it failed to inquire as to the meaning of "for reference" prior to bidding. This argument is misdirected. The facts do not present a question of CLI's duty to inquire regarding the meaning of the contract language. Rather than identify an ambiguity, the government's argument is a post-hoc rationalization of the Army's failure to fully evaluate CLI's proposal.

While preparing its proposal, CLI pursued a reasonable interpretation of the solicitation. There was nothing in the text of the solicitation that it found ambiguous. And the Army's grammatical analysis demonstrates that any ambiguity in the statement of work was so obscure CLI had no duty to inquire regarding its meaning. Then, there was a specific relevant pre-bid inquiry and an explicit answer by the government. CLI could rely upon that government response, which became part of the contract and which confirmed its understanding of its plan to use the GFI in creation of the 30 and 40 level manuals. *KiewitPhelps*, ASBCA No. 61197, 19-1 BCA ¶ 37,319 at 181,524. That inquiry also discharged any duty by CLI to seek clarification. *SPL Constr. & Development Corp.*, ASBCA No. 28699, 85-3 BCA ¶ 18,362 at 92,128. CLI then received further assurance as to how it could utilize 10 and 20 level manuals

---

* The Army did not explicitly ask for revision of the 10 and 20 levels manuals, but the references to procedures in those manuals by the 30 and 40 manuals are so extensive that the Army's position would effectively impose such an obligation on CLI.

9

from the government's acceptance of its proposal, its samples and subsequently the award of the contract. CLI reasonably relied upon those assurances in preparation of its proposal, and in support of its claim.

Moreover, CLI had no reason to suspect the government doubted its ability to perform the contract. Prior to award, ACC officials believed there may have been a mistake in CLI's price proposal. That belief was based upon a significant discrepancy between the government estimate and CLI's price. While disregarding CLI's work plan, the ACC contracting officials uniformly testified that they suspected a problem in CLI's proposal because of its low price. The contracting officer testified that he too was personally concerned with CLI's very low price. Notwithstanding these concerns, he did not alert CLI that there was a significant discrepancy between its price and the government's estimate. Nor did he attempt to explain the Army's perception that CLI must have misinterpreted the contract requirements, of which all ACC personnel should have been aware. His verification of CLI's price was wholly inadequate. *Straga*, ASBCA No. 26134, 83-2 BCA ¶ 16,611 at 82,618. The government ignored every indicator that CLI did not possess the same understanding of the GFI as reference material.

Thus, this dispute arises from that careless disregard of CLI's technical approach prior to December 2015. Even when CLI informed ACC at the start of work meeting that it reduced its costs by relying upon information from the 10 and 20 level manuals, neither the contracting officer, nor any government official, noticed or took exception. CLI had no notice of the government's contrary view of the GFI until it received a second round of comments, when the 30 manuals were nearly complete and substantial work had been performed in creation of the 40 manuals. CLI was then compelled to redo its work on the contract to comply with the government's revised expectations. But, the contract imposed no such requirements on CLI. In these circumstances, CLI is not responsible for the costs of the Army's mid-stream reformation of the statement of work to satisfy previously undisclosed requirements for simplified 10 and 20 level manuals.

## CONCLUSION

CLI's appeal is sustained, as to entitlement and returned to the parties for negotiation of quantum.

Dated: February 7, 2020

DONALD E. KINNER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61216, Appeal of Command Languages, Inc. d/b/a CLI Solutions, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

11